UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOCAL UNION 2-2000 UNITED STEEL,
PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED-
INDUSTRIAL, CHEMICAL AND SERVICE
WORKERS INTERNATIONAL UNION, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED-INDUSTRIAL, CHEMICAL AND
SERVICE WORKERS INTERNATIONAL
UNION,

               Plaintiffs,                          Case No. 1:11-cv-295

v.                                           HON. JANET T. NEFF

COCA-COLA REFRESHMENTS USA, INC,

               Defendant.
_____/

## OPINION

      Pending before the Court in this breach of contract case are the parties' cross-motions for

summary judgment on whether Defendant breached their 2009 Collective Bargaining Agreement

(CBA) by the timing with which Defendant implemented certain agreed-upon wage increases.

Defendant also moves for summary judgment in its favor on its threshold assertion that this action

is time-barred.  Having conducted a Pre-Motion Conference on this matter and having now fully

considered the parties' written briefs, detailed stipulated statements of fact and accompanying

exhibits, the Court finds that the relevant facts and arguments are adequately presented in these

materials and that oral argument would not aid the decisional process.  *See* W.D. Mich. LCivR

7.2(d).  For the following reasons, the Court grants Plaintiffs' Motion for Summary Judgment (Dkts 48, 49) and denies Defendant's Motion for Summary Judgment (Dkt 52).

## I.  BACKGROUND

Plaintiffs are United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW") and its local union affiliate, Local 2-2000 (Dkt 43, Joint Statement of Facts [JSF] ¶ 1).  The USW and Local 2-2000 (collectively "the unions") represent the collective bargaining unit of approximately 350 industrial workers employed at the Paw Paw, Michigan facility owned and operated by Coca-Cola Refreshments USA, Inc. ("Coca-Cola") (*id.*).  The unions and Coca-Cola were parties to a March 25, 2006–September 30, 2009 CBA ("2006 CBA") governing the union-represented unit at Coca-Cola's Paw Paw facility (*id.* ¶ 2).  During September 2009, the unions and Coca-Cola met on multiple occasions and bargained to replace the expiring 2006 CBA (*id.* ¶ 3).  The negotiators had between fifteen and twenty meetings (*id.*).

On September 28, 2009, the last day of bargaining, they bargained economics—wages and fringe benefits (JSF ¶ 3).  Regarding percentage wage increases, which is the topic at issue in this case, Local 2-2000 proposed the following:

Year 1:        3%

Year 2:        3.5[%]

Year 3:        4%

(JSF ¶ 4).  Later in the day, following caucus, Coca-Cola made a "Final Settlement Offer For New Collective Bargaining Agreement" (*id.* ¶ 5).  The final offer included economic and non-economic terms (*id.*).  Regarding percentage wage increases, Coca-Cola proposed the following:

Year 1:          0% increase

Year 2:          2.0% increase

Year 3:          3.0% increase

The "0%" for Year 1 called for a wage "freeze" (*id.*).  During their 2009 negotiations, the parties discussed percentage wage increases but did not discuss specific calendar dates for these increases (*id.* ¶ 6).

Later still on September 28, 2009, following additional caucus, the unions accepted Coca-Cola's final offer (JSF ¶ 7).  Labor Relations Manager Jenna Barresi modified the "Company Final Settlement Offer For New Collective Bargaining Agreement" on her laptop computer into a Tentative Settlement Agreement ("TA"), completing it at 9:27 p.m. on September 28, 2009 (*id.* ¶ 8).  After 9:27 p.m. on September 28, 2009, the parties signed the TA (*id.* ¶ 9).  According to the unions, bargaining ended with the September 28, 2009 TA (Dkt 43, Unions' Statement of Facts [USF] ¶ 12A).

The TA provided that the "agreement duration" was "October 1, 2009–September 30, 2012" (JSF ¶ 10).  The TA further provided that "[a]ll terms and conditions of the existing labor agreement, dated March 25, 2006 through September 30, 2009, shall remain in full force and effect except as modified herein" (*id.* ¶ 12).  Under the heading "Wages," the TA provided the following:

*Year 1:*          0% increase

*Year 2:*          2.0% increase

*Year 3:*          3.0% increase

(Dkt 39-4, Ex. 4 at 3).  Additionally, as to fringe benefits, the TA provided for three increases in Coca-Cola 401(k) contributions, "effective" May 2, 2010; May 1, 2011; and May 6, 2012 (*id.*).  The

TA provided for two "Retirement Plan" increases, "effective" March 25, 2010 and March 25, 2011 (*id.*). The TA provided for a $500 per-employee "ratification bonus" payable "within 14 days of ratification of this Agreement" (*id.* at 3, n.1). The TA provided for a $500 "lump sum payment" payable on January 8, 2010 to each employee "on the payroll on January 1, 2010" (*id.* at 3, n.2). The TA provided for three "sick & accident insurance" increases, "effective" April 1, 2009 (retroactively); April 1, 2011; and April 1, 2012 (*id.* at 4).

The TA was signed on September 28, 2009 by Coca-Cola General Manager Tracy Sweat; Coca-Cola International Director of Labor Relations Kent McVay; USW Staff Representative Richard Dietrich; and Local 2-2000 President Shaun Martin (JSF ¶ 13). According to the unions, the signed TA "memorializes the agreement reached at the table," reflected that the "parties reached consensus" and was "the agreed-upon document" containing the terms to be "presented to the union members for their vote" (USF ¶ 13A, 13C). The parties signed the TA because they had a "deal," subject to ratification by the Local 2-2000 membership (*id.* ¶ 13B). A pledge, proposed by Coca-Cola as part of its final offer, to "fully support and recommend" the TA "for ratification by the membership," was attached to the TA (*id.* ¶ 13D).

Labor Relations Manager Barresi prepared a red-lined document for the Local 2-2000 ratification vote (JSF ¶ 14). It included "all of the language from the 2006 agreement that was unchanged" and the "new language that had been agreed to during the 2009 bargaining," indicating the eliminated language by "cross-outs" and the new language by "underlines" (*id.*). The red-lined document provided that the new 3-year CBA was "made and entered into this 1st ~~26th~~ day of ~~March~~October, 200~~9~~6" and "would continue in full force and effect until ~~12:01~~11:59 p~~a~~.m., September 30, 201~~2~~09." (JSF ¶ 15). The red-lined document also provided the following:

4

**APPENDIX A**

**[YEAR 1: 0% increase**

**YEAR 2: 2.0% increase**

**YEAR 3: 3.0% increase]**

(*id.* ¶ 16 [bold and underlines in original]).  Barresi "used that Year 1, Year 2, Year 3 terminology in preparing the red-lined version because that is exactly what the terminology was in the TA and in the company's final settlement agreement" (*id.* ¶ 17).  The unions point out that Barresi did not use the Year 1, Year 2, Year 3 terminology for the fringe benefit increases in the red-lined document; rather, she used the various calendar dates specified in the TA for the fringe benefit increases (USF ¶ 17A).

Local 2-2000 members reviewed and voted to ratify (JSF ¶ 18).  Local 2-2000 notified Coca-Cola of the ratification on September 30, 2009 (*id.*).  Human Resources Manager Denise Brice-Walker testified that upon ratification, the "agreement between the parties is done" (USF ¶ 18G).  Similarly, General Manager Sweat agreed that "as of the notification ... that the union had ratified, the deal reached between the negotiators on September 28th was done" (*id.* ¶ 18H).  According to the unions, what remained after ratification "was putting everything together in a final document"—a "cleanup process," but "the substance of the terms were already agreed to" (*id.* ¶¶ 18I-18J).

Coca-Cola prepared a draft and gave it to Local 2-2000 for proofreading (JSF ¶ 19).  The draft, which was based on the red-lined document from Barresi, eliminated all the language that had been crossed out in the red-lined document (*id.*).  The draft included all the language that had been underlined in the red-lined document, but removed the underlines (*id.*).  Local 2-2000 negotiators

proofread a draft and proposed three corrections (*id.* ¶ 20).  On November 20, 2009, Brice-Walker identified these proposed corrections in an email to Barresi, with copies to Sweat and McVay (*id.*). Coca-Cola incorporated two of the proposed corrections (*id.* ¶ 21).  Specifically, Coca-Cola changed the term "chief steward" to "grievance committee chair person" in two places (*id.*).  Coca-Cola did not incorporate the third proposed correction because it determined that the phrase "sole prerogatives" identified by Local 2-2000 as being incorrectly spelled was, in fact, correctly spelled (*id.*).

Although the parties disagree on the timing and the specific draftsperson at Coca-Cola, they agree that Coca-Cola, at some later date, prepared the chart titled "Appendix A" and used March 21, 2010; March 20, 2011; and March 25, 2012 as the dates on which the percentage wage increases would occur.  The unions contend that Coca-Cola's finance department prepared the chart titled "Appendix A" in December 2009, and, according to the unions, the March dates used in the chart were not dates discussed at bargaining (USF ¶¶ 22B, 22C, 22K-L).  Coca-Cola contends that Barresi (its Labor Relations Manager), not its finance department, prepared the chart on October 21, 2009 (Dkt 45, Coca-Cola Statement of Facts [CSF] ¶ 19.c.2).  In either event, the Appendix A chart was not part of Coca-Cola's September 28, 2009 final settlement offer (Dkt 39-3, Ex. 3); the September 28, 2009 TA (Dkt 39-4, Ex. 4); or the September 30, 2009 ratification document (Dkt 39-5, Ex. 5).

Human Resources Manager Brice-Walker testified that the "effective date" of the 2009 CBA was:  "The 1st day of October" (USF ¶ 22O).  She testified that Year 2 of the 3-year 2009 CBA began on October 1, 2010 and that Year 3 of the 2009 CBA began on October 1, 2011 (USF ¶ 22O). The unions contend that the Local 2-2000 negotiators did not agree to "3/20/11" and "3/25/12" as the starting dates of the Year 2 and Year 3 percentage wage increases; rather, they agreed to the Year

2 wage increases to begin on the CBA anniversary at the beginning of Year 2 of the 2009 CBA, i.e.,

in October 2010, and to the Year 3 wage increases to begin on the CBA anniversary at the beginning

of Year 3 of the 2009 CBA, i.e., in October 2011 (USF ¶ 22P).

Local 2-2000 negotiators signed unattached signature pages supplied by Coca-Cola,

understanding that Coca-Cola would append the signed pages to a corrected and final 2009 CBA

(JSF ¶ 22). Coca-Cola compiled the signature pages signed by the Local 2-2000 negotiators and

signature pages signed by the Coca-Cola negotiators into a document incorporating two of the

corrections proposed by Local 2-2000 (JSF ¶ 23). Coca-Cola Human Resources Manager

Brice-Walker sent "two signed copies" and "seven single pages of signatures" to USW Staff

Representative Dietrich on January 18, 2010 (*id.*). She wrote: "Signatures are needed for the USW

AFL-CIO-CLC" and asked that Dietrich return signed copies "to the HR office at the Paw Paw

Plant" (*id.*).

Dietrich did not review the entire document supplied by Brice-Walker (JSF ¶ 24). He

reviewed what he considered to be "key negotiating items" from bargaining, including sections

addressing job bids, layoffs, safety and health and lead persons (*id.*). Dietrich did not review the

sections providing for fringe benefit increases, nor did he review the Appendix A chart (*id.*).

Dietrich believed that the Local 2-2000 had proofread and approved the numbers and arithmetic

necessary to incorporate the agreed-upon percentage increases in wages and fringe benefits and that

there was no reason for him to duplicate the Local 2-2000's efforts (*id.*). Dietrich signed the

document supplied by Coca-Cola, obtained signatures from the other USW representatives listed on

the signature pages, and returned signed copies to Brice-Walker (*id.* ¶ 25). The unions contend that

Dietrich mistakenly believed, based on the format of the ostensible final draft supplied by

7

Coca-Cola, that the Local 2-2000 negotiators signed the complete document supplied by Coca-Cola (USF ¶ 24A).

Coca-Cola had the signed copy printed in booklet form (JSF ¶ 26). Local 2-2000 distributed the printed booklets to unit employees on July 17, 2010 (*id.* ¶ 27). The July 2010 booklet included a printed version of the Appendix A chart prepared in December 2009, indicating that the 2 percent Year 2 wage increases were to take effect on "3/20/11" and that the 3 percent Year 3 wage increases were to take effect on "3/25/12" (Dkt 40-3, Ex. 8 at 65-66). According to the unions, the Local 2-2000 negotiators first read the Appendix A chart in July 2010 (USF ¶ 22N).

According to the unions, the distribution of the printed booklet resulted in "immediate protests" by unit employees to Local 2-2000 officers and negotiators (USF ¶ 27B). Specifically, members protested that the Appendix A chart in the booklet was mistaken, that it should have provided for the Year 2 wage increases in October 2010 and for the Year 3 wage increases in October 2011, consistent with "Appendix A" on page 48 of the ratification document approved by member vote on September 30, 2009 (*id.*).

As Local 2-2000 President Martin walked through the Coca-Cola facility when he came to work for the afternoon shift on July 17, 2010, shortly after the booklets were distributed, Martin was approached by bargaining unit members about the wage increase dates in the booklet's Appendix A (JSF ¶ 28). Martin e-mailed General Manager Sweat that same day, indicating that a "mistake has been found…in Appendix A which has to do with our wage increase" (*id.* ¶ 29). Martin wrote that as the "book" read, the Year 2 wage increase would come 18 months into the 2009 CBA, resulting in a Year 1 "wage freeze" lasting more than one year and a delay of "two years since our last wage increase" (*id.*). Martin wrote: "We need to get something in place as soon as possible to change the

increase date to the Oct. date for both this year [2010] and next year [2011]" (*id.*). Martin wrote that "it would be greatly appreciated" if "we could get this taken care of as soon as possible" as "it will become more of an issue the longer we wait in correcting the mistake" (*id.*).

Sweat understood that Martin was making a request to fix what Martin said was a mistake, asking that Sweat substitute October percentage wage increase dates for the March dates in the booklet's Appendix A chart (JSF ¶ 30). Barresi, who was copied with Martin's email, understood that the "gist" of what Martin was communicating was that "Year 2 and Year 3 increases should be on October 2010 and October 2011, not on March 2011 and March 2012, as indicated in the Appendix A chart in the booklet" (*id.*).

Sweat responded to Martin's email on July 17, 2010 (JSF ¶ 31). Sweat wrote that he was "trying to follow this" and "may be looking at this the wrong way" (*id.*). Sweat questioned: "The raise is not based on the ratification date, is it?" Sweat wrote: "If your raise occurs in March each year and you skipped a year due to lump sum, wouldn't it be March 2011 before there is a raise?" (*id.*). Dietrich had telephone conversations with Sweat and Barresi on or around July 22, 2010, after which he understood that Coca-Cola's position was that the wage increase dates were properly set forth in the booklet's Appendix A chart (*id.* ¶ 32).

Local 2-2000's concern about the wage increase dates in the booklet's Appendix A chart first came to Dietrich's attention when Martin raised it with him in July 2010 and when he saw Martin's July 17, 2010 email to Sweat (JSF ¶ 33). Dietrich telephoned and told him the parties' September 28, 2009 agreement, reflected in the TA and the ratification document, called for Year 2 percentage wage increases in October 2010 and Year 3 percentage wage increases in October 2011 and that the March 2011 and March 2012 dates in the booklet's Appendix A chart were mistaken and did not

accurately reflect the parties' September 2009 agreement (USF ¶¶ 33A, 33E). Dietrich said that he missed the March dates in the January 2010 draft, but this did not change the parties' agreement (*id.* ¶ 33E). Dietrich suggested to Sweat that the parties arbitrate the disagreement over the timing of the Year 2 and Year 3 wage increases, but Sweat said that Coca-Cola would not agree to arbitrate (*id.* ¶ 33G).

Coca-Cola did not implement 2 percent wage increases in October 2010 (JSF ¶ 34). Coca-Cola implemented 2 percent wage increases on March 20, 2011 (*id.* ¶ 35). Bargaining unit member base wage rates that were in place at the expiration of the 2006 CBA remained unchanged from October 2009 until March 20, 2011 (*id.* ¶ 36). Similarly, Coca-Cola did not implement the 3 percent wage increases in October 2011 but on March 25, 2012 (*id.* ¶¶ 37-38). The unions represent that the delayed implementation of the wage increases resulted in Coca-Cola's payment of approximately $346,000 in wages less than what Coca-Cola would have paid over the CBA duration had the wage increases been paid in October 2010 and 2011 (USF ¶ 38A).

Plaintiffs initiated this breach of contract action on March 23, 2011. Following a Pre-Motion Conference on April 27, 2012, the Court issued a briefing schedule (Dkt 28). The parties filed their motion papers in July 2012 (Dkts 38-58). Pursuant to FED. R. CIV. P. 56, the USW filed a motion for summary judgment in its favor on its claim that Coca-Cola breached the 2009 collective bargaining agreement by failing to timely implement the promised wage increases (Dkt 48). Local 2-2000 joined in the USW's motion (Dkt 49). Coca-Cola filed a response in opposition (Dkt 50), to which the USW filed a reply (Dkt 51). Coca-Cola also moves for summary judgment in its favor on the threshold assertion that the unions' action is time-barred (Dkt 52). The USW filed a response

in opposition to Coca-Cola's motion (Dkt 56), in which Local 2-2000 joined (Dkt 57).  Coca-Cola

filed a reply (Dkt 58).

## II.  ANALYSIS

### A.  Motion Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The

party moving for summary judgment has the initial burden of showing that no genuine issue of

material fact exists.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford &*

*Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989).  Once the moving party has made such a showing, the

burden is on the nonmoving party to demonstrate the existence of an issue to be litigated at trial.

*Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008).  The Court must view the evidence and draw

all reasonable inferences in favor of the nonmoving party.  *Slusher,* 540 F.3d at 453; *Harbin-Bey v.*

*Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). (citing FED. R. CIV. P. 56(e)).  The ultimate inquiry is

"whether the state of the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Slusher,* 540 F.3d at 453.

### B.  Discussion

The parties' motions pose two, relatively straightforward questions:  first, which limitations

period applies to this case—the six-month limitations period set forth in § 10(b) of the National

Labor Relations Act (NLRA), 29 U.S.C. § 160(b), or Michigan's six-year limitations period for

contract actions, MICH. COMP. LAWS § 600.5807(8); and second, whether Appendix A to the

parties' 2009 CBA accurately reflects the parties' agreement about when percentage wage increases

would be payable.

11

1.    *Which Limitations Period Applies*

The unions filed suit pursuant to § 301 of the Labor Management Relations Act (LMRA), which provides federal courts with jurisdiction over "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce..." 29 U.S.C. § 185(a). The substantive law to be applied in § 301 suits is generally federal labor law; however, there is no statute of limitations governing actions brought under § 301. The Supreme Court has held that the timeliness of such suits should be determined, as a matter of federal law, by applying the most analogous state statute of limitations. *Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703-04 (1966).

Coca-Cola argues in its motion for summary judgment that this action is governed (and barred) by the six-month limitations period set forth in NLRA § 10(b), 29 U.S.C. § 160(b) (providing that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made"). According to Coca-Cola, the Sixth Circuit applies this limitations period to LMRA § 301 breach of contract actions that more closely resemble an Unfair Labor Practice (ULP) charge (Dkt 52-1 at 6, 13-16, citing *Cummings v. John Morrell & Co.*, 36 F.3d 499 (6th Cir. 1994)). Coca-Cola argues that in filing an unfair labor practice charge based on the same subject matter as the Amended Complaint in this case, the unions have conceded § 10(b)'s application here (*id.* at 6, 14-16). Coca-Cola opines that applying the longer state contract law limitations period would permit the unions to wait until 2016 to file suit, notwithstanding the fact that they were aware of their potential breach-of-contract claim no later than July 2010 (*id.* at 6). In other words, the unions could wait until long after the contract had expired—and after likely

12

expiration of a successor agreement—before they complained about their contract rights (*id.*).  Coca-Cola agrees, however, that if the state contract law limitations period applies, then this suit was timely filed (Dkt 52-1 at 17 n.3).

According to the unions, this is "a straightforward suit under § 301" governed by Michigan's six-year limitations period for contract actions, MICH. COMP. LAWS § 600.5807(8) (providing that "[t]he period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract") (Dkt 56 at 14).  The unions argue that Coca-Cola's reliance on *Cummings* is misplaced inasmuch as the claim in *Cummings* was not a dispute over employer non-performance of a "discrete contractual obligation" to pay wages or benefits, as were the *Hoosier* and *Kraftco* claims and is the claim in the instant case  (*id.* at 18, citing *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704-05 (1966), and *Central States SE and SW Area Pension Fund v. Kraftco Inc.*, 799 F.2d 1098, 1107-08 (6th Cir. 1986) (en banc)).  The unions point out that both sides in this case agree that this Court can resolve this § 301 CBA-breach action by using the traditional rules for contractual interpretation to determine whether Coca-Cola discharged its duties under the 2009 CBA (*id.* at 19).  As for the import of the ULP charge they filed in March 2011, the unions emphasize that many, if not most, unilateral failures to meet CBA obligations are both ULPs (that the NLRB can address) *and* CBA breaches (that courts can address under § 301) (*id.* [emphasis in original]).

The unions' argument has merit.

In *Kraftco*, 799 F.2d at 1106, the Sixth Circuit Court of Appeals identified several reasons that led it to the conclusion that it was "inappropriate" to apply the six-month ULP limitations period to the LMRA § 301 breach of contract action before it.  The same conclusion is warranted on the facts here.  First, like the *Kraftco* complaint against the employer, the unions' Amended Complaint

13

here is lodged solely against Coca-Cola and relates solely to the employer's failure to comply with the terms of their agreement. "Hybrid lawsuits, by definition, involve two separate claims–one against the employer and one against the union." *Cummings*, 36 F.3d at 503. The pending complaint does not contain both a claim against the employer and one against the union. Second, the facts upon which the unions base their claim simply do not implicate the duty of fair representation, as that duty has been defined. As the Sixth Circuit emphasized in *Kraftco*, the duty of fair representation "was never intended to be a 'catch all' for undesirable union activity" but is implicated "only when an individual or group is treated differently by a union ... than another individual, group or the collective." 799 F.2d at 1106 (quoting *NLRB v. Local 299, Int'l Bhd. of Teamsters*, 782 F.2d 46, 51-52 (6th Cir. 1986)). The pending complaint does not allege a breach of the duty of fair representation, nor does the factual basis of the complaint implicate differential treatment. Therefore, a proper basis does not exist for characterizing the claim as one for breach of the duty of fair representation. Rather, as the unions point out, and as demonstrated by the Court's analysis *infra*, the issue in this case is what constitutes the contract of the parties, an issue that may be decided by reference to principles of contract law.

In sum, Coca-Cola's reliance on the exception for applying the six-month ULP limitations period to hybrid § 301/fair representation lawsuits is misplaced on these facts. As the Supreme Court made clear, application of a federal statute will be unusual, and "resort to state law remains the norm for borrowing of limitations periods." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 171 (1983). Indeed, in *Reed v. United Transp. Union*, 488 U.S. 319 (1989), the Court subsequently "admoni[shed]" observers to "take seriously" the rule that "analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with federal policies," *id.* at

327, characterizing the hybrid lawsuit exception as a "closely circumscribed exception" and "a narrow exception" to "the general rule that statutes of limitation are to be borrowed from state law," *id.* at 324.

The Court therefore determines that Michigan's six-year limitations period for contract actions, MICH. COMP. LAWS § 600.5807(8), applies to this § 301 breach-of-contract claim and holds that this action was timely filed. Accordingly, the Court denies Coca-Cola's motion to dismiss the action as time-barred.

2.    *Whether the CBA Reflects the Parties' Agreement*

Again, the enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law; however, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies. *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983). The parties do not dispute application of the rules the Sixth Circuit Court of Appeals set forth in *Yard-Man*. Specifically, the Sixth Circuit instructed that

> the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. . . . Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Yardman*, 726 F.2d at 1479-80 (citations omitted).

A court has the equitable power to reform a contract based on clear and convincing evidence that the contract, as drafted, did not conform to the agreement actually made. *Uskiewicz v. City of Alpena*, No. 285834, 2010 WL 199609, at *2 (Mich. Ct. App. Jan. 21, 2010) (citing *Casey v. Auto*

15

*Owners Ins. Co.*, 729 N.W.2d 277, 284-85 (Mich. Ct. App. 2006)).  "[C]ourts are required to proceed

with utmost caution in exercising jurisdiction to reform written instruments."  *Id.* (quoting *Olsen v.*

*Porter*, 539 N.W.2d 523, 525 (Mich. Ct. App. 1995)).  "The burden of proof is upon the party

seeking reformation to present clear and convincing evidence that the contract should be reformed

in order to carry out the true agreement of the parties." *Dingeman v. Reffitt*, 393 N.W.2d 632, 636

(Mich. Ct. App. 1986); *see also E.R. Brenner Co. v. Brooker Eng'g Co.*, 4 N.W.2d 71, 73 (Mich.

1942).

The unions first argue that the CBA terminology at issue here is unambiguous inasmuch as

one "year" lasts 12 months, there are three years in the 3-year CBA, and each contract year runs from

October through September (Dkt 48 at 19-22).  According to the unions, there is only one "Year 1,"

only one "Year 2," and only one "Year 3" in the 3-year CBA (*id.* at 19).  Therefore, the unions

contend that the Year 1 wage freeze started when the CBA began, and it should have ended when

the first year ended, 12 months later (*id.*).  Similarly, the Year 2 percentage wage increases should

have started on the first day of Year 2, on the CBA's first October anniversary, and the Year 3

increases should have started when Year 3 began on the CBA's next October anniversary and should

have lasted 12 months (*id.*).  The unions conclude that the terms chosen by the parties are plain and

simple and should be given their ordinary meaning as a matter of law (*id.*).

Alternatively, the unions argue that the contractual context, 2009 bargaining history, and

2006 CBA context prove that the parties agreed to anniversary-date percentage wage increases

payable in October 2010 and October 2011 (Dkt 48 at 23-27).  For example, the unions point out that

if the parties meant to change the ordinary meaning of the word "year" to mean an 18-month "Year

1," a 12-month "Year 2," and a 6-month "Year 3" in the 3-year CBA, then they would have said so,

and specified non-anniversary dates as they did with the fringe benefits (*id.* at 24).  The unions also point out that in the 2006 CBA, which took effect in March 2006, the percentage wage increases were due every twelve months, on the CBA's March anniversary (*id.* at 25).  The unions conclude that Coca-Cola should not be permitted to profit from mistaken writings and that the unions are entitled to enforcement of the 2009 agreement and reformation of the mistaken documents (*id.* at 28-32; Dkt 56 at 34).

Coca-Cola responds that because the language of the final, signed CBA unambiguously provides for March wage increase dates, the Court's inquiry should end there (Dkt 50 at 11; Dkt 52-1 at 19).  Coca-Cola additionally argues that the TA does not "trump" the final, signed CBA where (1) the TA is not the governing contractual document because it was superseded by a signed, more complete representation of the parties' agreement (Dkt 50 at 12-15); and (2) the TA itself does not actually state that percentage wage increases will occur on October 1, 2011 and October 1, 2012 and, in fact, expressly provides that "all terms and conditions of the existing labor agreement, dated March 25, 2006 through September 30, 2009, shall remain in full force and effect except modified herein" (Dkt 50 at 5, 16-17).  Coca-Cola further asserts that there is not clear and convincing evidence of mutual mistake supporting the unions' claim that Coca-Cola agreed to October dates, and the cases upon which the unions rely are distinguishable inasmuch as they involved mutual mistakes (Dkt 50 at 17-21; Dkt 52-1 at 20, 27).  Coca-Cola contends that, at most, this case involves a unilateral mistake on the part of the unions (Dkt 52-1 at 28).

The unions' argument has merit.

As a threshold matter, the Court finds the "Wages" provision of the parties' CBA ambiguous. The unions' October interpretation is as plausible as Coca-Cola's March interpretation.  *See*

*International Union, UAW Local 91 v. Park–Ohio Indus.*, 876 F.2d 894, at \*6 (6th Cir. 1989)
(unpublished per curiam) ("[B]oth parties have offered plausible interpretations of the agreement
drawn from the contractual language itself [which] demonstrates that the provision is ambiguous.").
The Court therefore takes the next step in the *Yard-Man* analysis, which is to look to the larger
context in which the parties' 2009 CBA exists.  *See Haytcher v. ABS Indus., Inc.*, 889 F.2d 64, 69
(6th Cir. 1989) (where both parties "presented plausible interpretations of the contractual language
of the pension agreement, ... extrinsic evidence may be properly introduced to resolve the
ambiguity.").  CBAs may contain implied terms, and the parties' practice, usage, and custom can be
considered.  *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 915 (6th Cir. 2000) (citing *Consolidated Rail
Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989)).

While Coca-Cola emphasizes the general rule that parol evidence is inadmissible to show
additional terms (Dkt 50 at 14, citing *UAW-GM Human Resource Ctr v. KSL Recreation Corp.*, 579
N.W.2d 411, 415 (Mich. Ct. App. 1998)), it is also the rule that parol evidence is admissible when
a party seeks to reform a writing on the grounds that it does not embody the agreement of the parties
because of mistake.  "When an instrument is claimed, by mistake of the draftsman or scrivener, not
to accurately reflect the agreement of the parties, the question whether such a mistake was made is
open to parol evidence."  *City of Detroit v. TXU Energy Retail Co., L.P.*, 221 F. App'x 387, 389 (6th
Cir. 2007) (citing *Scott v. Grow*, 3 N.W.2d 254, 259 (Mich. 1942)).  "Evidence of fraud or mistake
is seldom found in the instrument itself, from which it follows that unless parol evidence may be
admitted for that purpose, the aggrieved party would have as little hope of redress in a court of equity
as in a court of law."  *Goldberg v. Cities Serv. Oil Co.*, 266 N.W. 321, 325 (Mich. 1936).  Indeed,
"[s]uch evidence is admissible even in [a] case involving an unambiguous, fully integrated written

contract in an effort to show that the contract was a sham, illegal, or the product of fraud or mistake." *Uskiewicz*, 2010 WL 199609, at *3.

Therefore, "where there is any doubt as to the meaning of an instrument, the courts will consider the situation, acts, conduct and dealings of the parties to the instrument and also as to the subject-matter." *Farabaugh v. Rhode*, 9 N.W.2d 562, 565 (Mich. 1943). Where there is an ambiguity, or where the contract fails to express the obvious intention of the parties, "the courts will try to arrive at the intention of the parties and in accordance therewith grant or deny the relief asked for." *Id.; see, e.g., Strickland v. Moore*, No. 258506, 2006 WL 1328870, at *1 (Mich. Ct. App. May 16, 2006) (rejecting the defendants' assertion that "because there is no ambiguity in the terms of the deed, it must be enforced as written and reformation is, therefore, inappropriate.").

Here, the TA supports the unions' position that the parties agreed that the "Year 2" and "Year 3" percentage wage increases would commence on October 1, 2010 and October 1, 2011, respectively. The TA provided that the "agreement duration" was "October 1, 2009–September 30, 2012" (JSF ¶ 10). The red-lined document provided that the new 3-year CBA was "made and entered into this 1st ~~26th~~ day of ~~March~~October, 200~~9~~6" and "would continue in full force and effect until ~~12:01~~11:59 p~~a~~.m., September 30, 201~~2~~09" (JSF ¶ 15). Moreover, as the unions point out, the inclusion of specific non-anniversary dates for the fringe benefits provisions, and the omission of similar non-anniversary dates in the Wages provision, indicate a different treatment of the wages in the parties' agreement, a treatment similar to how the parties scheduled percentage wage increases on the anniversary of their 2006 CBA. In sum, unlike the Letter of Understanding upon which the parties in *Uskiewicz* relied, which was determined to be not binding and not a contract, 2010 WL 199609, at *3-4, the TA in this case, viewed in its larger context, is clear and convincing evidence

19

that both sides reached an agreement that the percentage wage increases would likewise occur on the anniversaries of the 2009 CBA.

In contrast, there is no support for Coca-Cola's claim that the parties bargained for an 18-month freeze spanning October 1, 2009 through March 21, 2011. Coca-Cola emphasizes the inclusion of the March dates in Appendix A to the signed copy of the 2009 CBA but fails to provide evidence of *agreement* to the contractual language, other than to proffer the subsequent statements of Coca-Cola's negotiators that Coca-Cola did not consider the March dates a "mistake" and the rationalization that the ratification bonus and lump sum payment were in lieu of a 2010 wage increase (CSF ¶¶ 11.c.3, 31.c.3). The Appendix A was not part of Coca-Cola's September 28, 2009 final settlement offer (Dkt 39-3, Ex. 3); the September 28, 2009 TA (Dkt 39-4, Ex. 4); or the September 30, 2009 ratification document (Dkt 39-5, Ex. 5). There is no evidence suggesting a meeting of the minds to the March dates for percentage wage increases. The record, viewed as a whole, instead indicates that the parties intended to establish wage increases concomitant with the CBA anniversaries, and that the resulting document does not adequately reflect their agreement.

Moreover, contrary to Coca-Cola's argument, these facts demonstrate a mutuality of mistake, not a unilateral mistake. Mistakes of law are divided into two classes: mistakes regarding the legal effect of the contract actually made and mistakes in reducing the instrument to writing. *Johnson Family Ltd. P'ship v. White Pine Wireless*, LLC, 761 N.W.2d 353, 363 (Mich. Ct. App. 2008) (citing *Schmalzriedt v. Titsworth*, 9 N.W.2d 24, 28 (Mich. 1943)). In the former, "the contract actually entered into will seldom, if ever, be relieved against unless there are other equitable legal features calling for the interposition of the court." *Id.* In the second class, where, as here, the mistake is not in the contract itself, "but terms are used in or omitted from the instrument which give it a legal

effect not intended by the parties, and different from the contract actually made, equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement." *See id.* (quoting *Schmalzriedt, supra*).

Having found clear and convincing evidence of an agreement by the parties as to the timing of the percentage wage increases (and a mistake in reducing that agreement to writing), the Court therefore determines that the existing, written contract must be reformed to resolve the ambiguity and conform to the parties' agreement. The Wages provision in the parties' 2009 CBA—specifically, Appendix A—is reformed to reflect the parties' agreement that the Year 2 percentage wage increases are payable on October 1, 2010 and the Year 3 percentage wage increases are payable on October 1, 2011. Accordingly, the Court grants the unions summary judgment because, under the 2009 CBA as reformed, Coca-Cola breached the agreement by improperly delaying the percentage wage increases and is obligated to "make whole" the union-represented employees for losses due to Coca-Cola's delays in implementing the agreed-upon increases.

### III.  CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' Motion for Summary Judgment (Dkts 48, 49) and denies Defendant's Motion for Summary Judgment (Dkt 52). An Order will be entered consistent with this Opinion. Further, because this Order resolves the last pending claim in this case, a Judgment in Plaintiffs' favor will also be entered.

DATED: November 21, 2012         /s/ Janet T. Neff
                                 JANET T. NEFF
                                 United States District Judge